# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

L., by and through her parents & next friends,
Mr. & Mrs. F.,
      Plaintiff,

      v.

NORTH HAVEN BOARD OF
EDUCATION,
      Defendant.

CIVIL ACTION NO.
3:08cv1592 (SRU)

## MEMORANDUM OF DECISION

L. and her parents (collectively, "the parents") seek review of a state administrative

Hearing Officer's determination that L.'s rights to a free appropriate public education ("FAPE")

in the least restrictive environment ("LRE") under the Individuals with Disabilities Education

Act ("IDEA"), 20 U.S.C. §§ 1400 *et seq.*, were not violated by the defendant North Haven Board

of Education ("the Board") for the academic years 2006-2007 and 2007-2008.  The parents

contend that L.'s Individual Education Plans ("IEP") for those years were not appropriate and

that the Hearing Officer's order that L. be placed in a private school was arbitrary, illegal, and an

abuse of discretion.   As relief, the parents ask this court to reverse the Hearing Officer's decision

and to enter a permanent injunction requiring the Board to "retain a mutually acceptable

educational consultant, and certified staff from a private agency who are skilled in behavior

management to address L.'s behavior and provide her with an appropriate special education

program first in the community and then, as her behavior improves, in the Public School at the

earliest practicable date."  Complaint Sec. V, ¶ 7.  The Board defends the Hearing Officer's

decision, arguing that the Board provided L. with a FAPE for both school years and that L.

requires an out-of-district placement in order to be educated safely and to modify her unsafe

conduct so that she can eventually be transitioned back to public school.  Both parties seek summary judgment.

The issue that must be determined on appeal is whether the Hearing Officer correctly determined that the IEP adopted at the November 14, 2007 Planning and Placement Team ("PPT") meeting provides L. with a FAPE in the LRE.  To the extent that the parents are challenging the appropriateness of L.'s 2006-2007 IEP and her 2007-2008 IEP (as it existed prior to November 14, 2007), the remedy that the parents seek is entirely prospective; that remedy would not specifically addresss and remedy past inadequacies of the programs in 2006-2007 and 2007-2008.  Although the parents claim they are seeking "compensatory education," as a practical matter, the only relief they are seeking is forward-looking in nature.  That is, the parents seek a determination that the Hearing Officer erred when she held that the out-of-district placement proposed by the Board at the November 14, 2007 PPT meeting would provide L. with a FAPE in the LRE; they ask this court to order the Board to hire a mutually agreeable team of independent consultants to craft a private, individualized program for L.  The Board and the parents, in fact, have the same goal – to place L. back in the public schools among her non-disabled peers as soon as possible.  They merely disagree about the appropriate way to achieve that goal.  Thus, the question is whether the Board's out-of-district placement provides L. a FAPE in the LRE, bearing in mind the issues raised by the parents in connection with her 2006-2007 and 2007-2008 IEPs.

Because the Hearing Officer's findings of fact and conclusions of law are clearly supported by a preponderance of the evidence in the record, her decision is affirmed.  Accordingly, L.'s motion for summary judgment is **DENIED** and the Board's cross-motion for

summary judgment is **GRANTED**.

## I.      IDEA Requirements & Procedures

The IDEA was enacted to "'promote the education of handicapped children'" by providing federal funds to those states that develop plans to ensure "'all children with disabilities the right to a free appropriate public education.'" *Walczak v. Fla. Union Free Sch. Dist.*, 142 F.3d 119, 122 (2d Cir. 1998) (quoting *Bd. of Educ. v. Rowley*, 458 U.S. 176, 179 (1982), *and* 20 U.S.C. § 1412(1)).  The IDEA "provides federal assistance for education of children with disabilities and requires that states receiving such assistance provide disabled students with a 'free appropriate public education' in 'the least restrictive environment' and devise an IEP for each disabled student." *P. ex rel. Mr. & Mrs. P. v. Newington Bd. of Educ. ("P. v. Newington")*, 546 F.3d 111, 114 (2d Cir. 2008) (quoting 20 U.S.C. § 1415(a)(1) and (5)) (internal citation omitted).

Once it is determined that a disabled child is covered under the IDEA, a group consisting of the child's parents and various school officials meet to create an IEP for the child.  In Connecticut, that group is referred to as the Planning and Placement Team ("PPT").  Conn. Agencies Regs. § 10-76a-1(10), (15).  Pursuant to 20 U.S.C. § 1414(d), an IEP must include the following information: "a statement of the child's present level of academic and functional performance, measurable annual goals, special-education and supplemental services, and any program modifications for the child, along with an explanation of the extent to which the child will not participate with non-disabled children in regular classes and activities, a projected date for the beginning of any special supplementary services or modifications, and the anticipated frequency, location, and duration of such services and modifications." *P. v. Newington*, 546 F.3d

at 114.  "In developing the IEP, the team must consider the child's strengths, the concerns of the parents, the results of the most recent evaluation of the child, and the academic, developmental, and functional needs of the child, along with other 'special factors,'" including the use of behavior interventions and supports and whether the child needs "assistive technology devices." *Id.*; 20 U.S.C. § 1414(d)(3).  The IEP must be reviewed "periodically, but not less frequently than annually" to determine whether the goals are being achieved and whether the IEP must be revised to address a lack of progress, the results of any reevaluation, information about the child provided to or by the parents, and the child's anticipated needs.  20 U.S.C. § 1414(d)(4).  The child's parents must be notified of any change in the child's educational program.  *Id.* § 1415(b)(3).

If the parents are dissatisfied with the IEP, they may file a complaint with the state's educational agency.  *Id.* § 1415(b)(6).  That complaint will be resolved by the agency at an "impartial due process hearing."  *Id.* § 1415(f).  Connecticut's administrative process is set forth at Connecticut Agencies Regulations §§ 10-76h-1 to 10-76h-18.  Any party dissatisfied with the agency's decision, may bring an appeal in state or federal district court.  20 U.S.C. § 1415(i).  The reviewing court "will then 'fashion appropriate relief based on its assessment of a preponderance of the evidence developed at the administrative proceedings and any further evidence presented by the parties.'"  *P. v. Newington*, 546 F.3d at 114 (quoting *Walczak*, 142 F.3d at 122-23).

The appeal is generally resolved through cross-motions for summary judgment, although the process in practice more closely resembles an appeal of an administrative decision.  *P.S. v. Brookfield Bd. of Educ.*, 353 F. Supp. 2d 306, 310 (D. Conn. 2005).  "The court does not attempt

-4-

to determine whether there are disputed issues of material fact, but rather bases its decision on the preponderance of evidence in the record." *Id.*

## II.     Factual Background

The facts are largely undisputed, although it bears mentioning that the parents' view of the facts, as set forth in their briefs and at the oral argument held on June 3, 2009, is not entirely consistent with the record. I have set forth only the facts most pertinent to this case; a more extensive recitation of the facts can be found in the Hearing Officer's Final Decision and Order. AR-1.[1] .

### A.     Pre-2006-2007 Academic Year

L. was born on November 14, 1995; she was 12 years old at the time of the due process hearing. Prior to the pending dispute, she had been attending the Board's schools since 1998. L. has Down Syndrome, and secondary to Down Syndrome, she has significant global delays in communication, gross and fine motor skills, memory processing, short-term memory processing, and cognitive limitations. The parties do not dispute that L.'s mental disabilities make her eligible for the rights afforded under the IDEA.

Since enrolling at the Board's schools, L. has attended a combination of special education and regular education classes. In addition to those classes, L. received speech therapy, occupational therapy, physical therapy, and one-on-one tutoring, provided by the Board. Beginning in 2002, the PPT implemented a series of Behavior Support Plans to target L.'s behavioral issues, including: flopping to the floor; wailing or crying "No;" abruptly leaving the group; and hitting, kicking, and spitting.

---

[1] Citations to the Administrative Record will be identified by "AR-__."

In response to a request from Mr. and Mrs. F, in 2003, the Board contracted with Area Cooperative Educational Services ("ACES") to provide an Assistive Technology ("AT") Assessment.  The PPT adopted a suggestion from that evaluation to purchase software, along with staff training from ACES.

In November 2005, the school social worker, Bonnie Muller, prepared a Functional Behavioral Assessment ("FBA") of L., which identified 24 problem behaviors.  Ex. P144 at 2.  In conjunction with the FBA, Muller prepared a Behavior Intervention Plan ("BIP"), which called for consequences for inappropriate behaviors, including "removal, count to 50 (Time-Out)."  *Id.* at 5.  The BIP also provided a crisis management plan that involved sending L. home to determine whether it affected her self-regulation.  *Id.*  Mrs. F. was critical of this plan, although she subsequently agreed to pick up L. from school when she was exhibiting her problem behaviors.  Ex. P143.  Mrs. F. became unhappy with the implementation and monitoring of L.'s behavior management strategies.  The PPT agreed to retain the Student Technical Response Team ("STAR") at the University of Connecticut A.J. Pappanikou Center for Developmental Disabilities to conduct a report on L. (the "STAR Report").

In the spring of 2006, L.'s inappropriate behaviors escalated.  Mrs. F. testified that she was called frequently to take L. home from school.  On May 11, 2006, L. was asked to stay home from school the day after she threw a chair at a staff member, bolted from a classroom towards an outside door, made verbal threats to staff members, and generally engaged in a pattern of hitting, spitting, and name calling.  The PPT meeting scheduled for May 23, 2006 decided to keep L.'s latest IEP in place until the results of the STAR report were released.  When it was released later that month, the STAR report concluded that L.'s behavior management plan was

inconsistently implemented, and that L. had become prompt-dependent, meaning she needed

assistance or prompting to complete or initiate all tasks she was asked to complete.  Ex. P160 at

4.  Additionally, the STAR report concluded that L. needed a more consistent behavior

management plan and that her behavior would be a factor in determining the amount of time she

should spend in a regular education setting.  The STAR report recommended a five-step plan,

including developing an effective and consistent behavior management system and hiring a

behavior consultant to assess and assist in developing that behavior management system.  *Id.* at

5-6.

      B.     <u>2006-2007 Academic Year</u>

      At the PPT meeting held June 16, 2006, the team reviewed the STAR report and the

updated AT evaluation.  Ex. P161.  The Board recommended that L. be placed in an out-of-

district special education program, which the parents rejected.  *Id.* at 4.  The Board also

recommended that L. undergo a psychiatric evaluation; Mr. and Mrs. F stated they would pursue

one at their own expense.  *Id.*

      Significantly, the team discussed and adopted L.'s 2006-2007 IEP.  *Id.*  That IEP set forth

a comprehensive set of academic and behavior goals and objectives for the school year.  *Id.* at 8-

19.  The PPT agreed that the Board would hire a behavior specialist to assist staff in planning and

training and that the Board would purchase additional AT software.  *Id.* at 4.  L.'s parents agreed

to consider having L. complete behavior ratings scales.  *Id.*  At Mrs. F's request, the PPT agreed

to review the behavior goals again in the fall.  *Id.*  The PPT resolved that L. would enroll at a 16-

day extended school year ("ESY") program at her elementary school over the summer.  *Id.*

According to the IEP adopted by the PPT, during the 2006-2007 academic year, L. would spend

19.25 hours per week (out of 31.25 hours) with her non-disabled peers and would receive additional speech therapy, occupational therapy, physical therapy, and one-on-one tutoring. *Id.* at 25. Including the time spent with her non-disabled peers in the regular education setting, working on a modified general education curriculum with one-to-one support from the special education staff, the IEP anticipated that L. would receive 27.25 hours per week of special education (out of 31.25 hours). *Id.* The PPT states that L. must receive special education because "[L.]'s intellectual disability requires support services for success in the regular education classroom." *Id.* There were no objections to the IEP's projection for L.'s time in the regular education versus special education setting noted in the minutes of the PPT meeting. *Id.*

In September 2006, as per the IEP and the STAR report's recommendations, the Board retained ACES to provide assistance with L.'s "consistent pattern [since spring 2006] of significantly disruptive and maladaptive behavior," including physical aggression towards staff and students, refusal to comply with staff directions, verbal abuse, verbal threats towards staff, hitting/spitting/biting, her tendencies to run away and to "trash" classrooms, and other non-compliant behaviors. Ex. P165 at 1-4. The Board requested that ACES provide a trained behaviorist to provide recommendations and training to help L. develop appropriate behavior. *Id.* at 2. On November 1, 2006, ACES presented its interim crisis intervention procedure, which was aimed at addressing L.'s increasing episodes of "eloping from the classroom and aggressive behaviors," to institute while the FBA was being completed. Ex. P167. The ACES crisis plan recommended several stages for dealing with L.'s maladaptive behavior. *Id.* at 1-2. During the initial stages of non-compliant behavior, L. was to be redirected back to the task or offered a choice of tasks. *Id.* If her non-compliance continued, particularly if she left her classroom and

refused to return, or if she was aggressive towards staff and students, L.'s parents were to be called and she would be sent home. *Id.* The ACES interim crisis intervention procedure acknowledged that sending L. home in response to non-compliance "may serve to strengthen both aggression and elopement." *Id.* at 1.

Mr. and Mrs. F. objected to the crisis intervention procedure, particularly the recommendation that L. be sent home if she engaged in non-compliant or aggressive behavior. Mr. and Mrs. F. had an independent psychologist, Dr. William M. Sherman, review the report. Ex. P168. Sherman opined that the November 1 ACES recommendations, particularly the plan to send L. home, would reinforce her escape/avoidance behaviors and make it harder to treat them later; in addition, he expressed concern that the plan contained no "preventative, proactive, reinforcement component of any sort." *Id.* at 3.

In the meantime, Mr. and Mrs. F. engaged Dr. James Black for a psychiatric evaluation of L. Ex. P162. Although he issued his report in August 2006, the parents did not provide the report to the Board until November 16, 2006. In that report, Black concluded that L.'s "surge in aggressive behavior" could be attributed, in part, to "vulnerability associated with her intellectual impairment" and that "as she becomes more aware of the disparity between herself and her peers in terms of coping skills, she is increasingly sensitive to perceived adult criticism and disapproval." *Id.* at 5-6. Black offered no recommendations. *Id.* at 6.

ACES presented its functional behavior assessment on November 13, 2006. The report concluded that L.'s problem behaviors stemmed from a frustration about her inability to successfully communicate her feelings and a desire to escape a potentially punishing situation. Ex. P173 at 1. The report recommended providing an escalating series of positive and negative

reinforcing activities when L. behaved appropriately or inappropriately. *Id.* at 4-5. Positive reinforcers included stickers, reading stories, art activities, and computer games. *Id.* at 4. Under the heading "Safety Management Plan," the report recommended that if L. engages in behaviors that are dangerous to herself or others, she should be escorted to a time-out area that is "devoid of stimulation" for a period of two or five minutes. *Id.* at 5.

In addition to hiring ACES to provide a consultant for L.'s behavioral issues, the Board hired Dr. Judy Itzkowitz, a special education consultant, to provide assistance in developing L.'s special education program and in assessing how L. could better participate in the general education environment with appropriate supplementary aides and services. Tr. 2/25/08 at 5-6.

In December 2006, the PPT convened to discuss the ACES report's proposed behavior support plan (the "ACES Behavior Plan"), Black's evaluation, and a STAR follow-up evaluation. Ex. P180. At the parents' request, the PPT did not discuss the school psychologist's behavior ratings scales. *Id.* at 2. The PPT discussed the IEP's behavior goals, making minor revisions to L.'s social/behavior goals and objectives. *Id.* Itzkowitz shared information about her observations of and interactions with L. *Id.* The PPT discussed introducing a new staff member to work with L. and the various disciplinary actions that had been implemented, and future actions that might be required. *Id.* at 2-3.

The PPT specifically discussed implementing the time-out portion of the ACES Behavior Plan, which the parents objected to. *Id.* at 2. The parents were concerned that the designated room was then being used as a storage closet. ACES representative Dr. Donn Sottolano testified that alternative rooms were proposed, including a school conference room, but that there were disagreements about what the chaperoning staff member could do during those time-outs. Tr.

6/13/08 at 70-71.  According to Sottolano, the room itself was not important so long as L. was not interacting with the observing staff member.  *Id.* at 71-73.  The parents wanted the staff member to engage L. in activities during the time out period, which Sottolano believed would undermine the purpose of time-out and would reinforce to L. that she could escape unpopular activities for a more fun environment.  *Id.*

On January 17, 2007, the PPT met to determine whether recent episodes of misconduct from November 11, 2006 to January 5, 2007 – including kicking, throwing objects, hitting, eloping, pushing, locking herself in the bathroom, etc. – were a manifestation of L.'s disability.  Ex. P190.  The PPT determined that the episodes of misconduct were a manifestation of L.'s disability, meaning she would not be disciplined for engaging in that inappropriate behavior.  Ex. P190 at 3, 6.  The PPT also agreed that the misconduct was not a direct result of the Board's failure to implement L.'s IEP, noting that the PPT had "frequently revised [L.'s] behavior Plan and have contracted with ACES Behavior Services for consultation.  The team agrees that the behavior plans to date have not been successful in reducing the behaviors in question."  *Id.* at 6.  In addition, the PPT reviewed L.'s Behavior Rating Scales, and ACES representative, Ellen Baecker, discussed the ACES Behavior Plan.  *Id.* at 3.  The parents did not agree with the ACES Behavior Plan or with the idea that sending L. home from school should continue to be used to address her bad behavior.  *Id.*  The Board declined the parents' request for an independent educational evaluation.  *Id.*  The PPT agreed to meet again a week later to discuss the parents' request for an independent educational evaluation and the behavior plan.  *Id.*

The PPT met again on January 24, 2007.  Ex. P191.  The PPT agreed to have the STAR team return for a follow-up evaluation.  *Id.* at 3.  The PPT discussed the ACES Behavior Plan,

but the parents would only grant consent to implementing the proactive components of the plan, not the time-out components, until the new STAR report could be completed.  *Id.*  The PPT adopted the interim behavior plan, as revised per the parents' request.  *Id.*  The PPT agreed that the parents and staff would receive training on the plan's implementation.  *Id.*  Finally, the PPT recommended holding regular team meetings. *Id.*

Baecker, the ACES representative, issued a revised behavior plan on February 8, 2007, which removed the time-out component.  Ex. P192.  The parents drafted a letter to the Board stating their continued objections to the ACES behavior plan, as revised.  Ex. P193.  They stated they objected to being asked to pick up L. from school and to having L.'s little sister taken out of her class to assist with L.  *Id.*  The letter notes that those strategies were not included in the revised ASEC plan and that the parents believed that no behavior plan should be implemented until all aspects had been discussed and agreed to at a PPT meeting.  *Id.*

The follow-up STAR report, prepared by Dr. Kathleen Whitbread, was released in April 2007 (the "April 2007 STAR Report").  Ex. P196.  The report noted that L. was spending 61% of her time with her non-disabled peers and that she was performing satisfactorily in all her IEP stated goals and objectives, except in her behavior goals and objectives.  *Id.* at 2-3.  The report notes that L.'s problematic behavior had remained "largely consistent" since preschool, noting her persistent issues with running away/eloping, aggression (hitting, kicking, biting, spitting, etc.), throwing or pushing objects, refusing to follow directions or engage in tasks, and refusing to move (laying on the floor or locking herself in the bathroom).  *Id.* at 4.  The report notes that the PPT had been unable to reach a consensus on the ACES recommendation for a time-out room due to the parents' ongoing objection to that strategy.  *Id.* at 6.  The report concludes that L.'s

history of "problematic and unsafe behavior" was "interfering significantly with learning and relationships." *Id.* at 8.  The report reviewed the 10 behavior assessments that had been conducted over the past eight years, noting that, although various positive and preventative strategies had been recommended and employed, a number of evaluators had indicated they were being implemented inconsistently.  *Id.*  The report noted the lack of a "record correlating specific behavior strategies with frequency or intensity of behavior."  *Id.*  The report states that because "seclusion time-out is a highly restrictive practice," that the PPT explore less restrictive methods before considering time-outs.  *Id.*  The report recommends: (1) retaining a mutually acceptable behavior specialist, (2) evaluating the quality of L.'s participation in the general education setting, (3) arranging to have L. spend more time with her non-disabled peers, (4) and adopting a different reading program to improve L.'s literary skills.  *Id.* at 8-10.

In addition to the behavior assessment, the April 2007 STAR Report assessed L.'s progress on her academic, speech, and motor skills goals and objectives.  *Id.* at 3-4.  Aside from her behavioral goals, the STAR Report noted that L. was progressing satisfactorily on 86% of her goals and objectives, with and without prompting, including satisfactory progress on her language arts skills (i.e., reading and writing), math skills, speech skills, tool use and self care skills, and motor skills.  *Id.*

On May 21, 2007, the PPT convened to review the April 2007 STAR Report and to conduct the annual review of L.'s IEP.  Ex. P200.  The PPT reviewed the STAR Report and recommended the Board retain the services of behavior specialist Dr. Ann Majure, a behavioral consultant proposed by the parents.  *Id.* at 3.  In addition, the PPT agreed that the services of the ACES staff would not be used to implement L.'s behavior plan.  *Id.*  At the parents' request, the

team discussed having Majure and Itzkowitz meet with the PPT at a future time to discuss a plan for Majure's services and to delineate each consultant's role. *Id.* The Board indicated it would be changing L.'s special education teacher and tutor, over the parents' objection that the staff changes wait until Majure became familiar with L.'s case. *Id.* The annual review of the IEP was postponed until the next PPT meeting in June 2007.

C.     2007-2008 Academic Year

On June 21, 2007, the PPT met to plan for the 2007-2008 academic year. Ex. P205. In addition to the usual participants, Itzkowitz and Majure were also in attendance. *Id.* at 1. At the meeting, the Board agreed to hire Majure for the 2007-2008 school year. *Id.* at 2. It was recommended that L. attend a summer ESY program, where she would be observed by Majure, and that she would enter the new school year as a 5th grader. *Id.* The consultants, L.'s regular and special education teachers, and her tutor/support personnel agreed to meet in August 2007. *Id.* The team noted L.'s need for support personnel at after-school activities and during her participation in school plays and concerts and that the parents had requested a female tutor for L. *Id.* The PPT agreed to reconvene the first week of school to discuss Majure's functional behavior assessment and the proposed goals and objectives for the 2007-2008 school year. *Id.* In addition, the team scheduled an AT consultation for September 2007. *Id.*

On August 31, 2007, Majure completed her functional behavioral assessment and intervention plan. Ex. P208. The purpose of the plan was to prevent certain behaviors by helping L. to develop "greater coping strategies and other, more acceptable strategies for expression." *Id.* at 1. The secondary purpose was to assure that L.'s support staff had safe, effective and consistent "reactive" strategies to use when L. did misbehave, noting that "aversive,

-14-

negative or punishing interventions are not acceptable methods of intervention." *Id.* Majure

concluded that the prior behavior plans that used "tangible reward/consequence" methods to

address L.'s behavior had had limited impact. *Id.* at 6. Majure believed it was "most

motivating" for L. to be "fully included with her peer group, doing what the other students her

age are doing, and being able to do things as independently as possible." *Id.*

Majure recommended that: each day L. should review a visual schedule of her day's

tasks; there should be a "chill out" space in the classroom with a beanbag chair, books, and

pictures that the whole class could use; L. should sit close to her teacher and away from the door;

and staff members working with L. should employ more visual materials to guide L. through

tasks. *Id.* at 4. Majure recommended engaging in preventative measures to avoid a

confrontation, such as removing distracting materials from L.'s desk and not using "hot button"

words. *Id.* at 7. To avoid unnecessary escalation, Majure's plan also recommended not stopping

L. when she sought to leave her classroom. Tr. 02/15/08 at 44 (Majure). If her aggressive

behavior escalated, L. should be escorted to a "safe space." Ex. P208 at 7, 10. Majure

emphasized this was not a "time-out room" but "an area that is private and quiet where she can

relax and calm down;" the report recommended looking for appropriate "safe spaces" in the

building. *Id.* at 10. The report stated that, if L. refused to accompany staff to the safe space, staff

trained in "safe physical management" should escort her there. *Id.* at 11. Finally, the report

recommended implementing data collection efforts to track L.'s behavior. *Id.* at 12.

A PPT meeting was held September 6, 2007 to discuss Majure's report and the upcoming

school year. Ex. P209. In addition to reviewing the proposed goals and objectives set forth in

the 2007-2008 IEP, the team agreed to implement the STAR Report's literacy program

recommendation and to place L. in more occupational, physical, and speech therapy for the 2007-2008 year. *Id.* at 2. The PPT reviewed and analyzed the Majure behavior management plan; the parents expressed some concern about the reactive strategy of escorting L. to a safe space, requesting, *inter alia*, that Majure be permitted to observe L. in the classroom as she saw fit and to have Majure train the school staff in "safe physical management." The PPT recommended that the school staff members working with L. receive physical management training. *Id.* at 2.

A Board administrator, Mary Van Deun, responded to the parents' concerns in a letter dated September 18, 2007. Ex. P211. Van Deun explained that because Majure did not offer physical management training, it would be undertaken at Majure's suggestion, by another entity, PMT Associates. *Id.*

At a PPT meeting on September 21, 2007, the team adopted the recommended IEP for 2007-2008. Ex. P212. In addition to setting out L.'s social/behavioral, communication, academic, independent living, and gross/fine motor skills goals and objectives for the year, the IEP states that L. would be educated with her non-disabled peers for a total of 26.25 hours a week (out of 31.25) and would spend the remaining 5 hours in a special education setting for reading instruction. *Id.* at 22. Finally, the PPT adopted the Majure behavior management plan, without modification. *Id.* at 3.

L. did not respond as well to her fifth grade teacher as she had to her fourth grade teacher; her fourth grade teacher had been better at getting L. to participate and comply with the academic exercises. Tr. 02/12/08 at 104 (Majure). As a result, L. began leaving her regular education classroom to go to the special education classroom, where she continued to work with the special education teacher and her tutor. *Id.* at 107-08. Majure testified that L.'s IEP goals, such as

reading skill development, were being implemented in the special education classroom, but that L. was missing out on the objectives that required her to remain with the regular education class. *Id.* at 108.

L.'s behavioral misconduct also intensified in the fall of 2007. In addition to entering unauthorized areas in the school, such as the administrative offices, other classrooms, and teachers' offices, L. left the school building at least four times in September and October 2007. Ex. P216. L. destroyed school and classmates' property, hit, spit on, threatened, scratched, punched, and kicked staff members. *Id.* Majure testified that, when she was observing L. in the regular classroom setting, she began to notice that L. was not responding to the peer motivating elements of her behavior management plan. Tr. 02/12/08 at 42-46 ("She did have some nice exchanges with other kids, but when there was expectations and academic demands placed on her, that's when she seemed to be very uncomfortable working around the other children.").

The PPT convened on October 29, 2007. Ex. P217. At that meeting, the "Team discussed [L.]'s demonstrated behaviors, [and] emotions she appears to be exhibiting about herself and her actions." *Id.* at 3. Mrs. F. stated that she believed L.'s sleep apnea was affecting L.'s behavior at home and at school. *Id.* Van Deun requested follow-up information about the sleep apnea diagnosis from L.'s doctor, specifically how it would affect L.'s level of alertness and academic readiness and her level of impulse control and compliance. Ex. P215. The parents provided the Board with a letter from L.'s doctor, dated November 9, 2007; the doctor could not answer the Board's questions regarding the disorder's effect on those issues. Ex. P218c.

On November 2, 2007, L. left the classroom to go to the bathroom. Following the guidelines set forth in the Majure behavioral plan, her tutor, Angela Price, followed her to the

bathroom, but did not stop her.  When they arrived at the bathroom, L. began to shove and punch

Price and bit her on the upper arm.  Exs. P216; P218a.  When the special education teacher came

to the bathroom to assist, L. threatened to poke her in the eye with a hanger.  Exs. P216d; P234.

The police were called, although both Price and the North Haven School Superintendent, Jane

Querfeld, declined to have L. arrested or prosecuted.  Ex. P218a at 2.  As a result of that incident,

L. was suspended for 10 school days, from November 2 to November 19, 2007.  Ex. P233 at 6.

On November 5, 2007, the school principal, Linda Cahill, wrote to the superintendent to

recommend that L. be expelled from the school.  Ex. P234 at 1.

On November 6, 2007, the parents were notified that a PPT meeting would be held on

November 14, 2007 to conduct a manifestation determination and to "review

placement/recommend alternative placement."  Ex. 218b.  The PPT convened on November 14,

2007 to discuss the incident.  Ex. P218d.  The team could not reach a consensus whether the

November 2 incident was a manifestation of L.'s disability, therefore, they agreed to proceed as

though it was a manifestation of her disability.  *Id.* at 3.  The PPT revised her IEP at that time,

removing her from regular classroom instruction and arranging for interim homebound

instruction, explaining that "[t]he team has determined that a sufficiently intense, structured and

safe program can not be offered in the public school environment at this time.  Alternative

options are being arranged."  *Id.* at 5.  As a homebound student, L. continued to receive five

hours a week of academic instruction at the Learning House and one hour a week each of

occupational and physical therapy.  *Id.*; Tr. 03/20/08 at 104 (Van Deun).

The Board contended that "despite the behavior assessments and behavior plan, that

[L.]'s dangerous behaviors have increased and that she is in need of a more intensive,

therapeutically based program to be able to develop more adaptive behaviors and increase her availability for learning." Ex. P218d at 3.  The parents agreed that more assistance for L. was necessary, but that the school should be able to provide that program.  *Id.*  Nevertheless, the parents agreed that they did not want L. to return to her elementary school.  *Id.*  The PPT recommended that the parents sign release forms to send referral information to out-of-district programs and that the parents make arrangements to visit those schools.  *Id.*

The Board requested Majure's assistance in seeking an alternative placement for L. and in developing a program for her at one of them.  Majure accompanied the parents to three private schools; Majure testified she found pluses and minuses to each school.  Tr. 02/12/08 at 144. Majure also accompanied the parents to observe the North Haven Middle School, where she believed L. could eventually return.  *Id.* at 144-46.  Her primary concern was whether each school was adequately equipped to handle L.'s behavioral issues.

L. remained at the Learning House throughout the duration of the due process hearing.  In February 2008, a Learning House representative reported that staff had been working to reverse L.'s "strenuously resistant behavior towards academic work," including refusing to stay in her seat, leaving the room, failing to do an assigned task, and inappropriately touching the room's objects or the teacher.  Ex. P236 at 3.  In March 2008, L.'s hours at the Learning House were increased to 10 hours per week.

After the Hearing Officer's decision, the PPT met twice to consider L's out-of-district placement.  Pl. Supp. Ex. A.  On January 12, 2009, L. began attending the Foundation School, a private out-of-district placement approved by the Board.  Pl. Supp. Ex. A, Aff. of Mrs. F, ¶ 10.

**III.     The Hearing Officer's Decision**

Mr. and Mrs. F. requested a due process hearing on November 15, 2007, the day after the

PPT team agreed to place L. in an interim, homebound instruction program.  The case was

assigned to Patricia M. Strong (the "Hearing Officer") who convened the hearing on January 10,

2008; additional days of testimony were held February 12, February 15, February 25, March 10,

March 12, April 11, May 2, June 13, and June 17, 2008.  The Hearing Officer issued her written

findings of fact and conclusions of law on September 26, 2008.

The Hearing Officer first rejected the parents' claims relating to procedural violations of

the IDEA.  The Hearing Officer concluded that all the claims were unsupported by the record and

that the "Parents were provided with their procedural safeguards, participated fully in the

November 14 PPT meeting and were represented by very able counsel" at that meeting.  AR-1 at

25.  The Hearing Officer further concluded that L. was permissibly suspended from school for

the ten-day period and that there was no decision by the Board to expel L. or to change her

placement prior to the November 14 PPT meeting.  *Id.* at 25, 30.  The Hearing Officer stated that

the parents had presented no credible evidence that the Board told them on November 2, 2007

that L. could not return to school and that their only options were expulsion or out-of-district

placement.  *Id.* at 30.

The Hearing Officer also rejected the parents' substantive challenges that L. had not been

receiving an appropriate FAPE under the IDEA in 2006-2007 and 2007-2008.  The Hearing

Officer first concluded that the parents' claim that the PPT had not considered whether to place

L. in regular classes with appropriate supports and services was not supported by the written

record.  The Hearing Officer noted that L.'s IEPs for 2006-2007 and 2007-2008 had

-20-

contemplated placing L. with her non-disabled peers for 62% and 80+% of the school week, respectively. *Id.* at 26. The Hearing Officer stated that although 80+% is a benchmark for school districts to strive for, that did not "change the analysis required for an individualized student's program," holding that Boards must have the flexibility to evaluate whether that is an appropriate amount of time on an individualized basis. *Id.* The Hearing Officer attributed L.'s need for the special education setting over the regular classroom in 2006-2007 to the lack of a fully operational behavior plan, placing the blame squarely on the parents' rejection of the ACES Behavior Plan, which she described as "an appropriate behavior plan for the 2006-2007 school year." *Id.* at 27. Notwithstanding the parents' objection to the 62% goal, the Hearing Officer noted that L. had made "satisfactory" progress on many of her IEP goals and objectives by the end of the 2006-2007 year, thus demonstrating that the Board had "offered the right balance between special education and regular education." *Id.*

The Hearing Officer next rejected the parents' argument that L.'s increasing misconduct in the fall of 2007, which culminated in her suspension on November 2, 2007, was the result of an improperly implemented behavior plan. *Id.* The Hearing Officer noted the conflicting assessments by Black and Majure: Black reported that L. became frustrated and angry about the differences between her capabilities and those of her non-disabled peers in the regular education classroom while Majure had constructed the behavior plan based on her belief that L. would be motivated to behave by remaining in the regular education setting. Finding that Majure later agreed that the behavior plan adopted for the 2007-2008 school year had been formulated on a faulty premise, the Hearing Officer concluded that any alleged failure by the Board to obtain physical management training or to engage in data collection was irrelevant to the ultimate result,

which was caused by L.'s frustration about being in the regular classroom with her non-disabled peers. *Id.* at 28.

The Hearing Officer next concluded that the plan proposed by the Board at the November 14, 2007 PPT meeting, but rejected by the parents, would have provided L. with a FAPE in an appropriate setting. Because L. was a danger to herself and others, the Board "had the legal right and obligation to offer and pursue a placement in a smaller, specialized program that contained the supports that had been identified as necessary for L. to make educational progress." *Id.* "[The Board]'s recommendation on November 14, 2007 for L. to attend an out-of-district private, state approved special education program in Connecticut offered her FAPE in the LRE in accordance with the IDEA's requirements." *Id.* The Hearing Officer further held that the decision to keep L. in the interim placement was completely attributable to the parents, and the fact that L. remained in that setting well into the 2007-2008 school year could not be the basis for a claim that the interim placement failed to provide FAPE. *Id.* The Hearing Officer held that, where the Board offers an appropriate program, the parents have no right to compel adoption of a specific program or methodology. *Id.*

Addressing the parents' claim that the IEPs were not appropriate because the Board failed to provide necessary AT, the Hearing Officer held that the record supported the conclusion that the L. had no unmet AT needs. *Id.* The Board had provided two AT evaluations and was in the process of providing a third when L. was suspended. The Hearing Officer credited the testimony from L.'s speech therapist that the parents' requested technologies were inappropriate and unnecessary for L. *Id.*

The Hearing Officer thus concluded that the 2006-2007 and 2007-2008 IEPs were

appropriate and that the 2007-2008 IEP could not have been implemented because L.'s behavior

"significantly impeded her ability to participate in regular classes." *Id.* at 30.  The Hearing

Officer ordered the PPT to convene and to implement the November 14, 2007 PPT to place L. in

a state-approved out-of-district placement that had available space and that could offer her a

program based on her present educational needs.  *Id.*

**IV.    Discussion**

     A.    <u>Standard of Review</u>

"The role of the federal courts in reviewing state educational decisions under the IDEA is

circumscribed."  *A.C. ex rel. M.C. v. Bd. of Educ.*, 553 F.3d 165, 171 (2d Cir. 2009) (internal

quotation and alteration omitted).  "The responsibility for determining whether a challenged IEP

will provide a child with an appropriate public education rests in the first instance with

administrative hearing and review officers."  *Walczak*, 142 F.3d at 129.  The agency's ruling is

then subject to "independent judicial review," however, "[t]he Supreme Court has cautioned . . .

that this 'independent' review 'is by no means an invitation to the courts to substitute their own

notions of sound educational policy for those of the school authorities they review.'"  *Id.* (quoting

*Rowley*, 458 U.S. at 206).  At the same time, "[w]hile federal courts do not simply rubber stamp

administrative decisions, they are expected to give 'due weight' to these proceedings, mindful

that the judiciary generally 'lack[s] the specialized knowledge and experience necessary to

resolve persistent and difficult questions of educational policy.'"  *Id.* (quoting *Rowley*, 458 U.S. at

206, 208) (internal quotations omitted).  "Deference is particularly appropriate" when the hearing

officer has conducted a "thorough and careful" review.  *P. v. Newington*, 546 F.3d at 118

(internal quotations omitted).

*Rowley* sets forth a two-part inquiry for federal courts reviewing agency resolution of complaints brought pursuant to 20 U.S.C. § 1415: a court must assess "(1) whether the state complied with the procedural requirements of the IDEA, and (2) whether the challenged IEP was 'reasonably calculated to enable the child to receive educational benefits.'" *P. v. Newington*, 546 F.3d at 118 (quoting *Rowly*, 458 U.S. at 206-07).

Mr. and Mrs. F. argue that the Hearing Officer erred in her conclusions that: (1) their procedural rights were not violated in 2007-2008; and (2) that L. was provided a FAPE in the LRE for 2006-2007 and 2007-2008.

B.     Procedural Objections

Taking up the procedural challenges first, the parents contend that the Hearing Officer erroneously concluded that the IDEA's procedural requirements were not violated in November 2007 when L. was suspended and the PPT agreed that L. should be placed in an interim, homebound program rather than returning to school at the conclusion of that suspension.  The parents argue that they were told prior to the PPT meeting that their only choices were expulsion or out-of-district placement, thus violating the IDEA's procedural requirements that changes to a student's IEP must be first discussed at a PPT meeting.  The Board contends that the Hearing Officer's determination that the IDEA's procedural requirements were not violated in 2007-2008 was supported by a preponderance of the evidence and, therefore, should be affirmed.

The first prong of the *Rowley* test requires the court to assess whether the Board complied with the procedural requirements of the IDEA.  *Rowley*, 458 U.S. at 206.  "The initial procedural inquiry in an IDEA case 'is no mere formality,' as 'adequate compliance with the procedures prescribed would in most cases assure much if not all of what Congress wished in the way of

substantive content in an IEP.'" *A.C. ex rel. M.C.*, 553 F.3d at 172 (quoting *Walczak*, 142 F.3d at

129).   Not every procedural error under the IDEA constitutes a denial of FAPE.  *See Grim v.*

*Rhinebeck Central Sch. Dist.*, 346 F.3d 377, 381 (2d Cir. 2003) ("[I]t does not follow that every

procedural error in the development of an IEP renders that IEP legally inadequate under the

IDEA.").  Under the IDEA, only where the procedural inadequacy (1) "impeded the child's right

to a [FAPE]," (2) "significantly impeded the parents' opportunity to participate in the

decisionmaking process regarding the provision of a [FAPE] to the parents' child," or (3) "caused

a deprivation of educational benefits," will it be deemed capable of denying a child a FAPE.  20

U.S.C. § 1415(f)(3)(E)(ii)(I)-(III).

   The parents first contend that the Hearing Officer erroneously found that they had not

offered credible evidence to prove that their daughter's placement was changed prior to the

November 14 PPT meeting.  The parents point to Mrs. F's testimony on March 10, 2008 when

she stated that the superintendent told her that L. would receive a 10-day suspension, a 180-day

expulsion, and an alternative placement, i.e., that she would not be returning to the elementary

school.  Tr. 03/10/08 at 43-45.  She further testified that Majure had received similar information

from Van Deun, that L.'s only choices were out-of-district placement or expulsion.  *Id.*

   The uncontroverted evidence in the record, however, demonstrates that no change to L.'s

placement actually took place until the November 14 PPT meeting.  At that meeting, the PPT

held a manifestation determination; it was agreed that they would treat the November 2 incident

as a manifestation of L.'s disability, thus effectively taking expulsion off the table.  In addition,

the PPT meeting minutes demonstrate that all members of the PPT, including the parents, agreed

that L. should not return to the elementary school.  Although there was a subsequent

disagreement about L.'s placement – individualized instruction, with a goal of transitioning to the middle school, versus out-of-district placement in a private school until L. could transition to the middle school – the uncontroverted evidence in the record shows that no change in the placement took place until the appropriate PPT meeting was convened and that all members of the PPT agreed that L.'s placement needed to be changed.  The fact that discussions about L.'s possible placement took place prior to the PPT meeting cannot give rise to a procedural violation where no change in placement actually occurred until the PPT meeting and where all parties agreed that returning to the elementary school was off the table.

The parents next complain that there was a failure to hold enough PPT meetings in the fall of 2007 to address L.'s escalating behavioral issues and lack of progress in the general education curriculum.  The uncontroverted evidence, however, demonstrates the following: (1) there were four PPT meetings held between September 6, 2007 and November 14, 2007; (2) the behavior management plan crafted by Majure was not implemented until the September 21, 2007 PPT meeting; (3) the next meeting was held on October 29, 2007, when L.'s behavior problems *were* discussed – the PPT meeting minutes show that the team discussed L.'s behavior and that the parents raised L.'s sleep apnea disorder as an explanation for her behavioral problems; (4) Mrs. F. agreed that one month was not "really a good amount of time" to discern whether the behavioral plan was working or not, Tr. 01/10/08 at 74; and (4) the final behavioral incident occurred just four days after that PPT meeting, on November 2, 2007.  Therefore, it is not clear how an additional PPT meeting between September 21 and October 29 would have resulted in a significant change to the behavior plan so that a failure to hold a PPT in that time was a procedural violation that deprived L. of an FAPE.

Finally the parents argue that their procedural rights were violated by the Board's failure to introduce the out-of-district placement option at the November 14 PPT meeting or at the prehearing conference.  That argument is completely belied by the record – the minutes of the November 14 meeting show that the PPT expressly discussed placing L. at a private school.  In fact, the PPT recommended at least two schools at that point, and recommended that the parents sign the necessary release forms so that the referral information could be sent to specific out-of-district programs.  Furthermore, the parents were on notice that out-of-district placement would be discussed at the November 14 meeting because the notice of the PPT meeting sent to the parents stated that one purpose of the meeting would be to "review placement/recommend alternative placement."  Ex. P218b.  Therefore, there is no basis upon which the parents can argue that they failed to receive adequate notice about out-of-district placement until after the due process hearing had commenced.

For those reasons, I conclude that there were no procedural inadequacies in 2007-2008 that deprived L. of a FAPE and, therefore, the Hearing Officer's determination on this prong of the *Rowley* test is affirmed.

C.    Substantive Objections

The second prong of the *Rowley* test requires the court to determine whether the disabled child was substantively denied free appropriate public education in the least restrictive environment, i.e., "whether the challenged IEP was 'reasonably calculated to enable the child to receive educational benefits.'" *P. v. Newington*, 546 F.3d at 118 (quoting *Rowley*, 458 U.S. at 206-07).  "IDEA does not itself articulate any specific level of educational benefits that must be provided through an IEP."  *Walczak*, 142 F.3d at 130.  In *Rowley*, "[t]he Supreme Court . . .

specifically rejected the contention that the 'appropriate education' mandated by IDEA requires states to 'mandate the potential of handicapped children.'" *Id.* (quoting *Rowley*, 458 U.S. at 197 n.21, 189).  Although the second prong does not require that the state seek to "maximize" a disabled child's potential, nevertheless, "the door of public education must be opened in a 'meaningful way,' and the IEP must provide the opportunity for more than only 'trivial advancement.'" *P. v. Newington*, 546 F.3d at 119 (quoting *Walczak*, 142 F.3d at 130).  "An appropriate public education under IDEA is one that is likely to produce progress, not regression." *Walczak*, 142 F.3d at 130 (internal quotation omitted).

Mr. and Mrs. F. primarily challenge the 2006-2007 IEP as inappropriate on the ground that it did not provide for a sufficient amount of time in a regular education classroom, i.e., a "least restrictive environment."  In *P. v. Newington*, 546 F.3d at 120, the Second Circuit expressly adopted the Third Circuit's test for determining whether an IEP places a student in the least restrictive environment, as set forth in *Oberti v. Clementon School District*, 995 F.3d 1204, 1215 (3d Cir. 1993).  The two-pronged *Oberti* test states that a court must consider, first, "whether a student can be satisfactorily educated in the regular classroom with the benefit of supplemental aids and services," and, second, if the court determines the school district was justified in removing the child from the regular classroom and placing him or her in a special education classroom, "whether the school has included the child in school programs with nondisabled children to the maximum extent possible."  *P. v. Newington*, 546 F.3d at 121 (quoting *Oberti*, 995 F.2d at 1218).  When analyzing the first prong of the *Oberti* test, the court should consider several factors, including:

(1) whether the school district has made reasonable efforts to accommodate

> the child in a regular classroom; (2) the educational benefits available to the child in a regular class, with appropriate supplementary aids and services, as compared to the benefits provided in a special education class; and (3) the possible negative effects of the inclusion of the child on the education of the other students in the class.

*Id.* at 120 (quoting *Oberti*, 995 F.2d at 1217-18).

In *P. v. Newington*, the Second Circuit considered and rejected the invitation to adopt a presumption that a disabled student should be placed in a regular classroom at least 80% of the time to meet the least restrictive environment requirement. *Id.* at 122. ("We do not think that 80% is presumptively adequate or that less than 80% is presumptively inadequate."). "Recognizing that Connecticut school authorities may have found this percentage figure useful, we conclude that mandating such a percentage in every case would be inconsistent with the IDEA's directive that schools take an individualized approach to each student." *Id.* "While including students in the regular classroom as much as is practicable is undoubtedly a central goal of the IDEA, schools must attempt to achieve that goal in light of the equally important objective of providing an education appropriately tailored to each student's particular needs." *Id.*

      1.    *2006-2007 IEP*

The parents object to the Hearing Officer's determination that the 2006-2007 was appropriate under the IDEA, contending, *inter alia*, it was inappropriate because it did not place L. in a regular education classroom for more than 80% of her time and because the behavior management plan was not properly implemented.

The parents first contend that, because the IEP only provided for L. to spend less than 80% of her time in a regular education setting, the 2006-2007 IEP was per se inappropriate. As explained above, the Second Circuit in *P. v. Newington* specifically rejected that argument,

-29-

stating that determinations must be made on the basis of each student's individualized needs.

Because there is no serious dispute that L. needed to spend at least part of the day in a special education setting in 2006-2007, the pertinent issue is whether she was, nevertheless, placed in a regular education setting with her non-disabled peers to the maximum extent possible. It is undisputed that L.'s time in the regular education setting was significantly curtailed by her behavioral problems. Because her behavioral issues were the primary reason she did not meet her IEP general education goal in 2006-2007, the question is thus whether her behavioral plan was adequate or properly implemented.

I agree with the Hearing Officer's determination that the Board offered an appropriate behavior plan for 2006-2007 and any deficiency in its implementation cannot be attributed to the Board because the parents refused to accept a central concept of that plan – the time-out room. In 2006-2007, at the parents' request, the Board retained a team of behavioral specialists from ACES to design an appropriate behavior management plan for L. The ACES Behavior Plan called for both positive and negative reinforcements, including the use of a time-out room, to address L.'s tendency to elope and generally avoid activities she disliked. The behavior plan was discussed at PPT meetings and the parents ultimately refused to grant consent to the use of the time-out room, requiring the plan to be modified to eliminate that aspect. Although the parents attribute their refusal to the Board's suggested use of a storage closet as the time-out room, the record demonstrates that other rooms were also suggested, including a school conference room, and that the "closet" was not, in fact, a closet, but rather a small office that was being used to store unneeded items, which would have been removed had the room been chosen for L.'s time-out space. The parents appear to have generally disagreed with the ACES approach to provide a

bland, stimulus-free environment.  Although they would have preferred that L. have some activities during her time-out period, ACES disagreed, stating that providing preferred, alternative activities would be counter-productive to the time-out room's purpose, i.e., to encourage L. to remain engaged in her general education class tasks.

Having failed to grant consent to a major component of the ACES Behavior Plan, the parents cannot now complain that the Board failed to create or implement a proper behavior plan for the 2006-2007 school year.  It is further inaccurate to characterize the Board's efforts between December 2006 and June 2007 as having done "nothing," as the parents contend.  The record clearly establishes that, at the parents' request and pursuant to the STAR Report's recommendation, the Board hired behavioral specialists to create a workable behavior plan. When the parents initially rejected the approach set forth in that ACES report, the Board asked ACES to modify its plan, which was discussed and analyzed at multiple PPT meetings.  Also during those months, the Board agreed to hire a special education consultant and to bring the STAR team back to conduct a comprehensive follow-up analysis of L.'s progress.  When the STAR Report recommended hiring another behavior specialist, the Board hired the parents' hand-picked choice, Dr. Majure, to design the behavior plan for the 2007-2008 school year. Notwithstanding the lack of a complete behavior management plan, by June 2007, L. still had achieved at least satisfactory progress on all her IEP goals and objectives, save for her behavioral goals.  Therefore, the Hearing Officer did not err when she concluded that L.'s 2006-2007 IEP was appropriate and provided her with regular education classes "to the maximum extent appropriate given her individual needs."  AR-1 at 30.

2.      *2007-2008 IEP*

The parents next contend that the Hearing Officer erred in her conclusion that the 2007-2008 IEP was appropriate and that it could not be implemented as written because L.'s behavior significantly impeded her ability to participate in the regular education setting.  The parents' argument that the Hearing Officer's decision is unsupported by the record is without foundation.

The record demonstrates the following.  First, to craft L.'s 2007-2008 education and behavior management plan, the Board hired the two independent consultants requested by the parents – Drs. Itzkowitz and Majure.  After reviewing L.'s records, observing L. in her summer school program, and consulting with L.'s parents and teachers, Majure presented a functional behavioral assessment and a behavioral intervention program, which sought to address L.'s behavioral issues.  In addition to helping L. develop greater coping strategies and more acceptable strategies for expression so that she could better participate in the general education setting, the behavior management plan designed by Majure called for "effective and consistent reactive strategies" to employ if L. did misbehave.

Majure testified that, after the behavior plan was implemented in September 2007, L. did not respond, as Majure had expected, to certain elements of the behavior management plan, including the theory that L. would be motivated to behave by being with her non-disabled peers in the general education class.  Majure testified that, once the school year began, that strategy was not "reinforcing for [L.].  She didn't seem to want to be around the other children.  She didn't seem to want to be in the classroom."  Tr. 02/15/08 at 42.

As a result, L. would often leave the classroom and go to her special education classroom. *Id.* at 45.  Following Majure's behavior plan, L.'s tutor and teacher did not prevent her from

leaving the classroom.  L., therefore, ended up spending less than 80% of her day in the general education setting.

At the time L.'s 2007-2008 IEP was created and adopted on September 21, 2007, there was nothing inappropriate about its goals and objectives, nor with the accompanying behavior management plan designed by Majure, which tracked the parents' stated concerns with the prior ACES Behavior Plan.  Despite the implementation of the IEP and behavior plan and the best efforts of the Board, L.'s parents, and Majure, L.'s misbehavior began to escalate.  As Majure later testified, her primary theory that L. would be motivated to behave by the presence of her non-disabled peers was not borne out in practice.  In fact, Majure observed that L.'s frustration levels increased when she was asked to complete tasks in the general education classroom, which resulted in an increase in departures from her regular class.  Therefore, the problem was not that the Board failed to properly implement the behavior management plan, but that the plan designed by the parents' hand-picked behavior specialist was not effective at targeting and reining in L.'s misbehavior.  The behavior plan was designed around the faulty premise that being in the presence of her non-disabled peers would motivate L. to behave; thus, even if the Board had begun implementing the data collection component of that plan, it would not have made any difference to L.'s increase in behavioral misconduct that fall.  L.'s final episode of misconduct halted any opportunity for the Board, parents, and independent consultants to re-design or tweak L.'s IEP and behavior management plan.

Where the Board acceded to the parents' request to hire Majure to design a behavior plan, and where the record demonstrates that it was properly implemented according to its terms, the fact that it was insufficient to rein in L.'s misconduct, which ultimately resulted in her suspension

and removal from the public school environment, does not mean that L. was deprived of a FAPE in the LRE.  On the contrary, the record demonstrates that the Board and its staff made a sufficient effort to educate L. within the bounds prescribed by the behavior management plans in both 2006-2007 and 2007-2008, behavior management plans designed by independent consultants chosen by the parents and amended at the parents' request.  That L.'s needs can no longer be addressed in the public school environment does not mean that she was not receiving a FAPE in the LRE while she was enrolled in the North Haven Public Schools.

Finally, I agree with the Hearing Officer's assessment that L.'s amended IEP recommending an out-of-district placement would provide L. with a FAPE in the LRE.  As a threshold matter, it is not in dispute that, for the time-being, L. should not return to the North Haven Public Schools.  At the November 14, 2007 post-suspension PPT meeting, all parties agreed that L. should not return immediately to the public school setting.  Indeed, as remedial relief, the parents do not seek L.'s immediate return to public school; instead, they seek to require the Board to retain a mutually acceptable independent consultant to develop and implement an IEP and behavior plan "to transition L. back to public school at the earliest practicable date."  Pl. Memo. in Support of Summ. Judg. at 90.  In light of the basic agreement that L.'s medium-term goal should be to return to public school, it was not error for the Hearing Officer to conclude that the Board need not hire a team of independent consultants to recreate the same type of program that L. could receive at a state-approved, private school.

D.    Remedy

The parents contend that the Hearing Officer lacked jurisdiction to order the PPT to consider an out-of-district placement for L., characterizing that order as a "remedy."  Citing

-34-

*L.M.P ex rel. E.P v. Florida Department of Education*, 2008 WL 4218120, at *4 (S.D. Fla. 2008), for the proposition that "the power to award a remedy is contingent on a violation of the IDEA," the parents argue that, because the Hearing Officer held that the IDEA was not violated, she was not permitted to enter a remedy.

The parents mischaracterize both the facts of *L.M.P.* and the Hearing Officer's order. First, in *L.M.P.*, the Court was merely noting that the parents' argument that hearing officers should be permitted to grant equitable relief was purely speculative because the Eleventh Circuit had already determined that the school district was not denying their children FAPEs. *Id.* at *4-5. The Court believed the question whether state hearing officers should have equitable authority was not properly before it because there was no violation of the IDEA to remedy, even if the Court held that such equitable authority should exist. *Id.*

Second, the Hearing Officer's order in this case did not order a "remedy" in the absence of a violation of the IDEA, but rather directed the PPT to proceed as it otherwise would have in the absence of the parents' challenge to the November 14, 2007 IEP modification. Rejecting the parents' challenge to the modified IEP and holding that placing L. in a private, out-of-district placement would provide her FAPE in the LRE, the Hearing Officer's order essentially permitted the PPT to implement the modified IEP as if no challenge had been brought.

Contrary to the parents' characterization of the order, it does not bind them from taking their own course of action or from challenging L.'s IEP in the future. Once the Hearing Officer determined that the Board was acting in accordance with its obligation under the IDEA to provide a FAPE in the LRE, it was still within the parents' discretion to decide whether they wanted to accept the Board's offer of an out-of-district placement or to proceed on their own.

Therefore, however inartfully worded, the Hearing Officer was not ordering the PPT or the parents to place L. in an out-of-district placement, but rather was permitting the process to proceed as if no challenge had ever been brought.

Significantly, the Hearing Officer's order does not enjoin the parents from filing future challenges to L.'s placement moving forward. If they believe that the Foundation School is not providing L. with a FAPE in the LRE, they remain free to bring that challenge under the IDEA.

**V.    Conclusion**

In light of my holding on both the 2006-2007 and 2007-2008 IEPs, it is unnecessary to consider the plaintiff's additional and alternative arguments. The Hearing Officer's order is **AFFIRMED**.

For the foregoing reasons, the plaintiff's motion for summary judgment (**doc. #30**) is **DENIED** and the defendant's cross-motion for summary judgment (**doc. #32**) is **GRANTED**. The motion to bifurcate the motion for attorneys' fees (**doc. #29**) is **DENIED AS MOOT**. The clerk is directed to enter judgment for the defendant and close the file.

It is so ordered.

Dated at Bridgeport, Connecticut, this 10th day of June 2009.

         /s/ Stefan R. Underhill
        Stefan R. Underhill
        United States District Judge